**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ROSETTA DAVIS,

       *Plaintiff*,

    v.

                             Civil Action No. 17-245 (TJK)

TOM VILSACK,

       *Defendant*.

**<u>MEMORANDUM OPINION</u>**

Rosetta Davis, a former Department of Agriculture employee, brings several claims under Title VII and the Rehabilitation Act. According to Davis, the Department engaged in a campaign of harassment and retaliation against her for protected activity and because of her disabilities. The Department moves for summary judgment. For the reasons explained below, the Court will grant the motion as to all counts except for Count III, which pleads a failure-to-accommodate claim under the Rehabilitation Act. The Court will dismiss that claim for lack of subject-matter jurisdiction because Davis failed to exhaust her administrative remedies.

## I.    Factual and Administrative Background

Davis's claims stem from a series of workplace tribulations during her time at the Department, which she alleges violated her rights under Title VII and the Rehabilitation Act. Her problems with the agency span nearly a decade. *See* ECF No. 43-2 ¶¶ 76–90; ECF No. 49-3 ¶¶ 76–90. In the operative complaint, Davis describes a concerted campaign against her, alleging patterns of discrimination, retaliation, and harassment dating back to 2002. Third Am. Compl. ¶¶ 20–24, ECF No. 27 ("TAC"). Management's motives, she says, were manifold—she reported unethical behavior in the early 2000s, *id.*; she had a sexual relationship with a supervisor, the nature of which

the parties contest, *id.* ¶¶ 25–36; *compare* ECF No. 43-2 ¶¶ 12–13 *with* ECF No. 49-3 ¶¶ 12–13; and she filed an EEO complaint against a former supervisor for disability discrimination, TAC ¶¶ 37–47.  From there, she claims she was shuffled around the department involuntarily until she landed in the Farm Service Agency's Office of Civil Rights ("FSA-OCR") in January 2014—all in retaliation for earlier protected activity.  She further alleges that, around the time she started in FSA-OCR, she assisted in a whistleblower investigation related to the Department's treatment of EEO complaints.  TAC ¶ 68.

Although these allegations comprise the lion's share of Davis's complaint, the story she tells bears little resemblance to the parties' positions at summary judgment.  That may be because many of her allegations predate a 2011 settlement agreement resolving Davis's 2011 EEO complaint, in which she agreed to "waive any and all claims for . . . pecuniary, . . . nonpecuniary and/or compensatory damages based on allegations raised in any claim or alleged claim of employment discrimination against [the Department] arising prior to the effective date of [the] Agreement." ECF No. 43-32 ¶¶ B(2)–(3); ECF No. 43-2 ¶ 91; *see also* ECF No. 49-3 ¶ 91.  In any event, the allegations supporting the claims Davis defends at summary judgment begin in January 2014, when during a "major reorganization that affected all of the employees in [the Office of the Assistant Secretary for Civil Rights]," the Department reassigned Davis to the Farm Service Agency's ("FSA's") Office of Civil Rights ("FSA-OCR").  ECF No. 43-2 ¶¶ 19, 96 (internal quotes omitted); ECF No. 49-3 ¶¶ 19, 96.

### A.    Davis's Time at the Farm Service Agency's Office of Civil Rights

Davis's January 2014 reassignment to FSA-OCR was anything but smooth.  At first, she was dissatisfied with all the red tape surrounding her keycard access, transit benefits, and the transfer of her personal belongings.  *See* ECF No. 43-4 38:4–10; ECF No. 43-38 15:3–4; ECF No. 43-52 at 12; ECF No. 43-2 ¶¶ 101–02; ECF No. 49-3 ¶¶ 101–02.  Then came disputes with her

supervisor, Darlene Thompson.  *See* ECF No. 43-2 ¶¶ 19, 21–27, 32; ECF No. 49-3 ¶¶ 19, 21–27, 32.  Both Davis and Thompson characterized the beginning of their relationship as positive.  ECF No. 43-15 (audio tape); *see also* TAC ¶ 79.  But the relationship took a turn.  *See* ECF No. 43-15 (audio tape); *see also* TAC ¶ 79.

Davis and Thompson's souring relationship came to a head in October 2016, when Davis was due for a performance appraisal.  TAC ¶ 82.  Before the meeting, Thompson requested that Davis submit written performance accomplishments before the meeting.  ECF No. 43-2 ¶ 23; ECF No. 49-3 ¶ 23.  Davis declined to do so.  ECF No. 43-2 ¶ 24; ECF No. 49-3 ¶ 24.  Even without the written accomplishments, Thompson rated Davis's work as "fully successful"—but not "superior."  ECF No. 43-2 ¶ 25; ECF No. 49-3 ¶ 25.  She explained her decision by pointing to poor work performance, tardy and missed assignments, a combative attitude, and other workplace issues.  ECF No. 43-15 (audio tape); ECF No. 43-2 ¶ 26; ECF No. 49-3 ¶ 26.  Thompson explained that she believed Davis was entitled only to a "marginal" rating but that, in "good faith" and in recognition of Davis's "potential," she decided to award Davis a rating of "fully successful" instead.  ECF No. 43-13 at 8–9.

During the performance review meeting, Davis lashed out at Thompson in response to her criticism.  ECF No. 43-15 (audio tape); ECF No. 43-2 ¶ 32; ECF No. 49-3 ¶ 32.  She called Thompson "nasty," "hostile," "dishonest," and "quite a disappointment."  ECF No. 43-15 (audio tape); ECF No. 43-2 ¶ 32; ECF No. 49-3 ¶ 32.  She also brought up issues in Thompson's personal life.  ECF No. 43-15 (audio tape).  Toward the end, Thompson asked Davis to remain for another meeting.  ECF No. 51-1 ¶ 63.  The parties dispute whether Thompson blocked the exit, but Davis left the room rather than stay for the meeting.  *Id*. ¶¶ 64–65.

After her performance review, Davis "did not want to have to go back into that work environment."  ECF No. 43-2 ¶ 38; ECF No. 49-3 ¶ 38.  And indeed, eight days after the dispute, the Department placed Davis on paid administrative leave.  ECF No. 43-2 ¶ 37; ECF No. 49-3 ¶ 37.  The Department then began searching for a new position for Davis.  *See* ECF No. 43-2 ¶ 42; ECF No. 49-3 ¶ 42.  A few months later, in February 2017, the Department reassigned Davis to FSA's Emergency Preparations Division ("FSA-EPD").  *See* ECF No. 43-2 ¶ 42; ECF No. 49-3 ¶ 42.  In connection with this transfer, Davis's title shifted from "Management Program Analyst 343" to "Program Specialist 301 series," which, according to Davis, changed not just her "title, duties, [and] responsibilities" but also "demoted" her and gave her "a black eye for the upper mobility of [her] career growth" by reducing her promotion potential.  ECF No. 43-52 at 5–8.

Meanwhile, on November 4, 2016, during her paid administrative leave, Davis contacted an EEO counselor.  ECF No. 43-2 ¶ 79; ECF No. 49-3 ¶ 79.  She then filed an EEO complaint on January 9, 2017 based on her performance review meeting with Thompson.  ECF No. 43-2 ¶ 80; ECF No. 49-3 ¶ 80.  Days later, she supplemented her complaint to allege that her placement on administrative leave constituted retaliation and gender discrimination.  ECF No. 43-2 ¶ 81; ECF No. 49-3 ¶ 81.  Then in March 2017, she again supplemented her complaint to allege that her reassignment to FSA-EPD was retaliatory and that her employer failed to grant her reasonable accommodation request for "an ergonomic keyboard and an ergonomic chair."  ECF No. 43-2 ¶¶ 82–83; ECF No. 49-3 ¶¶ 82–83.

### B.    Davis's Time at the Farm Service Agency's Emergency Preparations Division

Davis's time at FSA-EPD, starting in February 2017, was also riddled with disputes.  The first disagreements involved office space, computers, and ergonomic equipment.  To start, FSA-EPD assigned Davis an office in an above-ground basement.  ECF No. 51-1 ¶¶ 81–83; ECF No. 43-23 42:10–18.  After Davis stated she could not work in that space because of her disability,

FSA-EPD assigned her to an office in its other workspace in the Patriot Plaza III building. ECF No. 51-1 ¶ 87; ECF No. 43-23 45:3–5. That building and the "basement" level were the only two spaces where EPD had office space. ECF No. 43-11 29:18–30:8, 48:18–21.[1] But Davis refused to work in Patriot Plaza III because Thompson worked in the same tower. ECF No. 51-1 ¶ 89. The Department ultimately granted Davis's request for a different office after she provided documentation that the request stemmed from her mental illnesses. ECF No. 43-2 ¶ 45; ECF No. 49-3 ¶ 45 (disputing only the date this occurred). Davis's request for a new office was memorialized in a 2017 formal request for reasonable accommodations. *See* ECF No. 43-24.

Davis's other two disputes upon her arrival at FSA-EPD involved equipment. First, Davis was dissatisfied with her older laptop computer; she preferred a newer model or a desktop version. ECF No. 49-6 199:6-8; ECF No. 49-1 at 23 ("Ms. Davis worked on a lap top [sic] for her entire tenure at FSA-EPD."). The other dispute related to ergonomic equipment, which Davis requested along with the different office in her 2017 accommodation request. *See* ECF No. 43-24. In October 2017, the Department denied this request because Davis had requested the specific equipment that she had used while working for another division, and that "equipment [was] no longer available." *Id.*

Beginning in November 2017, Davis and her employer became embroiled in another dispute—this time over telework and her placement on absent without leave ("AWOL") or leave without pay ("LWOP") status for supposed unapproved teleworking. *See* ECF No. 43-23 20:5–10, 23:18–19; 32:1–6, 40:15–20; ECF No. 43-49 at 6, 10, 13–14; ECF No. 43-11 14:11–13, 16:20–17:15. The parties do not disagree that Davis sometimes teleworked with permission on an ad hoc,

---

[1] Davis contests this point, but she points to no evidence to the contrary other than her vague assertion that she saw empty offices elsewhere. *See* ECF No. 49-1 at 26 (citing ECF No. 43-52 at 5 (2018 Davis Affidavit)).

case-by-case basis. ECF No. 51-1 ¶ 99. The dispute was over whether the Department ever placed Davis on LWOP when she teleworked with permission. *See* ECF No. 43-2 ¶ 59; ECF No. 49-3 ¶ 59. In any event, the parties agree that in February 2018, Davis was placed on LWOP for unapproved telework twice when she was in fact in the building—but also that the Department corrected this mistake. ECF No. 43-2 ¶ 60; ECF No. 49-3 ¶ 60. Soon afterward, on February 13, 2018, Davis again contacted an EEO counselor. ECF No. 43-2 ¶ 85; ECF No. 49-3 ¶ 85.

Also in February 2018, another controversy arose when Davis took the stage—uninvited—at a workplace event celebrating Black History Month. *See* ECF No. 43-2 ¶ 61; ECF No. 49-3 ¶ 61. She accused several Department leaders of harassment and mistreatment and made gestures that caused offended employees to complain. ECF No. 43-20; ECF No. 43-21. These events were captured on video. *See* ECF No. 43-20; ECF No. 43-21. Afterward, the Department again placed Davis on paid administrative leave. ECF No. 43-2 ¶ 74; ECF No. 49-3 ¶ 74.

In May 2018, Davis filed another EEO complaint about events in February through May 2018 related to her office-space and equipment problems, the telework and LWOP disputes, and her then-current status on administrative leave. ECF No. 43-2 ¶¶ 84–89; ECF No. 49-3 ¶¶ 84–89. Then, in November of that year, she submitted another accommodation request for full-time telework, to "reframe from inflamed environments," for a flexible work schedule, and for new ergonomic equipment (rather than the old equipment she requested in 2017). ECF No. 43-26. The Department granted the latter three, but as to the first granted only part-time telework. *Id*. Davis refused the accommodations. ECF No. 43-2 ¶ 52; ECF No. 49-3 ¶ 52. Because Davis claimed she could not perform the functions of her job without full-time telework, she requested a reassignment to a position that would permit teleworking. ECF No. 51-1 ¶¶ 127–34. The Department could not find a suitable reassignment, so it removed her from her position. *Id*.

## II.     Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor."  *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).

To survive summary judgment, a plaintiff must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).  Courts "are not to make credibility determinations or weigh the evidence."  *Lopez*, 826 F.3d at 496 (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).  But the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50 (citations omitted).

"The movant bears the initial burden of demonstrating that there is no genuine issue of material fact."  *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017).  "In response, the non-movant must identify specific facts in the record to demonstrate the existence of a genuine issue."  *Id.*  And for claims where the nonmovant bears the burden of proof at trial, she must make an evidentiary showing "sufficient to establish the existence of [each] essential element to [her] case."  *Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and therefore entitles the

moving party to "judgment as a matter of law." *Id.* at 323. "Importantly, while summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of [her] obligation to support [her] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 17 (D.D.C. 2009) (cleaned up).

## III.   Analysis

The Department moves for summary judgment on all counts of Davis's operative complaint, which alleges a retaliatory hostile work environment under Title VII (Count I); unlawful retaliation under Title VII (Count II); failure to accommodate her disability under the Rehabilitation Act (Count III); hostile work environment under the Rehabilitation Act (Count IV); and intentional infliction of emotional distress (Count V). For the reasons below, the Court will grant the Department's motion for summary judgment on all counts except Count III, which it will dismiss for failure to exhaust administrative remedies.

Before proceeding further, the Court must note that Davis's opposition to the Department's motion is confusing to say the least—rife with redundant and disjointed allegations, missing, incorrect, or nonexistent record citations, and claims that were not brought in the operative complaint. Despite the sloppiness that pervades Davis's briefing, the Court did its best to understand and address her arguments in opposition. Still, as explained below on several occasions, the law does not require the Court to scour the record for evidence to support Davis's arguments or read her mind to fill the gaps in her reasoning.

### A.   Rehabilitation Act Claims (Count III)

Under the Rehabilitation Act, an employee may sue her employer for denial of a reasonable accommodation for her disability. Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* But the Rehabilitation Act bars recovery through a civil lawsuit until an employee has exhausted her

administrative remedies.  *See, e.g.*, *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006).  To exhaust, the employee must contact an EEO counselor within forty-five days of an allegedly discriminatory action and then seek administrative relief.  *See* 29 C.F.R. § 1614.105(a); *Lenkiewicz v. Castro*, 118 F. Supp. 3d 255, 261 (D.D.C. 2015).  In this Circuit, issues such as timeliness "concerning how a claimant participates in that administrative process, both procedurally and substantively, are not of jurisdictional moment."  *See Doak v. Johnson*, 798 F.3d 1096, 1103–05 (D.C. Cir. 2015).  But statutory requirements under the Rehabilitation Act are still jurisdictional, and those prerequisites include filing an administrative complaint.  *Id.*; *see Lenkiewicz*, 118 F. Supp. 3d at 260 (quoting *Spinelli*, 446 F.3d at 162).  Accordingly, a plaintiff bears the burden of proof on this point.  *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 58 (D.D.C. 2011).

At the outset, the Court notices that both parties spill considerable ink over the Department's purported failure to provide Davis with ergonomic equipment.  Although Davis requested such equipment as a reasonable accommodation for her disability both in 2017 and 2018, her complaint in this matter does not bring any Rehabilitation Act claim alleging the Department failed to provide it.  *See* TAC ¶ 119.  In fact, the complaint does not allege that she requested ergonomic equipment as a reasonable accommodation at all.  What is more, Davis's Rehabilitation Act claim challenges the Department's failure to accommodate a specific, "known mental impairment—chronic anxiety."  *Id.* ¶ 118.  But she argues in her opposition brief that she "required the use of an ergonomic keyboard and chair because of wrist and hip injuries she suffered en route to a work-related training"—not to accommodate her anxiety.  ECF No. 49-1 at 26.  Any way you slice it, Davis's arguments that the Department violated the Rehabilitation Act by failing to supply her ergonomic equipment impermissibly broaden the complaint.  *See Chatman v. Perdue*, No. 17-cv-1826 (JEB), 2020 WL 6075678, at *4 (D.D.C. Oct. 15, 2020) ("It is well established that a plaintiff

cannot broaden her complaint in a summary-judgment opposition brief."); *Martin v. District of Columbia*, 78 F. Supp. 3d 279, 316 n.55 (D.D.C. 2015) (explaining a plaintiff improperly broadened her complaint at summary judgment by arguing the defendant retaliated against her for participating in an investigation, but "the amended complaint nowhere mentions the . . . investigation *in connection with* either the Title VII or DCHRA retaliation claims" (emphasis added)). So at least as far as Count III goes, the Court need not consider parties' disputes over these requests.

Turning to the actions Davis *does* point to in her complaint in this matter, she contends the Department violated the Rehabilitation Act by (a) "not giving her an office," (b) "forcing her to sit in the basement," and (c) "denying her requests for telework or a transfer to a different sub-agency so that she could work under management officials who were not named in her prior EEO complaints." TAC ¶ 119. Davis has not made any case at all that she exhausted her administrative remedies on these claims. In fact, far from meeting her burden to show she exhausted a Rehabilitation Act claim relating to these requests, she concedes she didn't. *See* ECF No. 49-1 at 24. On her office-related claims, Davis instead argues that her failure to do so "is inconsequential" to her broader Rehabilitation Act claim "because Defendant still failed to provide her with a working computer or any equipment that she required to do her job." *Id.* This attempt to restate her ergonomic equipment claim gets her nowhere because—as the Court has already explained—Davis failed to bring any such claim in her complaint. Thus, she has failed to meet her burden to prove she administratively exhausted her office-related claims.[2]

---

[2] Davis's concession is no surprise because the Department *granted* her accommodation request for an office above the basement level in October 2017, she accepted the accommodation, and she did not contact an EEO counselor on the issue—none of which Davis disputes. ECF No. 49-1 at 24; ECF Nos. 43-24, 43-34. That said, Davis's real gripe here appears to be that the Department unreasonably *delayed* providing her a suitable office for several months. But despite her repeated emphasis on this point, she never makes clear whether she seeks to bring an independent

The same is true of her claims about the Department's denial of telework or transfer.  To start, the record contains no evidence that Davis was ever denied—or that she even requested—a transfer within the Department as a reasonable accommodation.  Indeed, Davis makes no effort to defend that claim in her papers.  *See* ECF No. 49-1 at 21–25.  Davis did, however, request 3–4 days per week of telework in a November 2018 accommodation request, which the Department denied.  ECF No. 43-26.  But the parties agree that Davis did not contact an EEO counselor after that date or file a new EEO complaint.  *See* ECF No. 43-2 ¶¶ 76–89; ECF No. 49-3 ¶¶ 76–89.  So she has not exhausted her administrative remedies for the telework claim either—and again, she does not contend otherwise.  *See* ECF No. 49-1 at 21–25.

In all, Davis failed to exhaust her administrative remedies with respect to the Department's conduct she alleges violates the Rehabilitation Act.  Thus, the Court will dismiss Count III for lack of subject-matter jurisdiction and deny the Department's motion for summary judgment on that count as moot.  *See Klute v. Shinseki*, 797 F. Supp. 2d 12, 18 (D.D.C. 2011) ("[I]f a plaintiff fails to exhaust his Rehabilitation Act claims as required by Section 501, the claims are subject to dismissal for lack of subject-matter jurisdiction because jurisdictional exhaustion may not be excused." (cleaned up)).

### B.      Title VII Retaliation Claims (Count II)

Employers may not retaliate against an employee who "has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).  "In order to prevail upon

---

Rehabilitation Act claim based on this delay or explain how, if at all, she administratively exhausted such a claim.  *See* ECF No. 49-1 at 24.  "[A] litigant has an obligation to spell out [her] arguments squarely and distinctly, or else forever hold [her] peace."  *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).  If Davis meant to advance an exhausted Rehabilitation Act claim based on this delay, she did not do so "squarely" or "distinctly," and she pointed to no facts showing the Court's jurisdiction over it.  *See Nichols v. Vilsak*, No. 13-cv-1502 (RDM), 2015 WL 9581799, at *1 (D.D.C. Dec. 30, 2015) ("[C]ourts are not responsible for hunting through the record in search of material . . . helpful to a party's case.").

a claim of unlawful retaliation, an employee must show 'she engaged in protected activity, as a consequence of which her employer took a materially adverse action against her.'" *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009) (quoting *Weber v. Battista*, 494 F.3d 179, 184 (D.C. Cir. 2007)).  Retaliation claims are defined by allegations of "discrete . . . retaliatory acts."  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).

When a plaintiff does not present direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework governs.  *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014).  First, the plaintiff bears the burden of establishing her prima facie case, specifically by showing "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two." *Massaquoi v. District of Columbia*, 285 F. Supp. 3d 82, 87 (D.D.C. 2018) (quoting *Jones v. Bernanke*, 557 F. 3d 670, 677 (D.D.C. 2018)).  If the plaintiff makes such a showing, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for its action, which then shifts the burden back to the plaintiff to produce evidence sufficient to create a genuine dispute of material fact as to whether the employer's proffered reason is a pretext for unlawful retaliation.  *See id*.

That said, when a defendant proffers a nonretaliatory reason for its action, courts do not resolve whether the plaintiff has established her prima facie case.  Rather, in those circumstances, the "central question" left for the Court to decide is whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted [legitimate] reason was not the actual reason," but a pretext for unlawful discrimination or retaliation.  *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see also McGrath v. Clinton*, 666 F.3d 1377, 1380 n.3 (D.C. Cir. 2012) ("Where, as here, the employer has proffered a non-retaliatory explanation for a materially adverse employment action, the sufficiency of the plaintiff's prima facie case

is no longer in issue, and 'the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation.'" (quoting *Jones*, 557 F.3d at 678).

To begin, despite alleging a laundry list of purportedly retaliatory acts in her complaint, Davis abandons most of them for purposes of summary judgment. In her opposition to its motion, Davis argues only that the Department retaliated against her by (1) reassigning her to the FSA-EPD and (2) placing her on administrative leave in 2016 and 2018. *See* ECF No. 49-1 at 8–14. As to the other incidents, she makes no effort to meet her burden to "identify specific facts in the record to demonstrate the existence of a genuine issue."[3] *See Montgomery*, 875 F.3d at 713; *see also* ECF No. 43-1 at 42–47 (moving for summary judgment on Davis's retaliation claims about her LWOP designations and other matters for which she did not allege an adverse action). More-over, "[j]udges are not expected to be mindreaders," and "a litigant has an obligation to spell out [her] arguments squarely and distinctly, or else forever hold [her] peace." *Schneider*, 412 F.3d at 200 n.1; *cf. Ctr. for Biological Diversity v. Raimondo*, 610 F. Supp. 3d 252, 277 (D.D.C. 2022) ("A court can treat 'specific arguments as conceded' when a 'party fails to respond to arguments in opposition papers.'" (quoting *Drinkel v. MedStar Health*, 880 F. Supp. 2d 49, 58 (D.D.C. 2012)). On that basis, the Court will grant the Department summary judgment on Davis's retaliation claims related to incidents other than the FSA-EPD transfer and administrative-leave episodes.[4] And as explained below, her remaining retaliation claims fail for other reasons.

---

[3] The allegations of retaliation Davis abandons for summary judgment purposes include her allegation that the Department refused to promote her to a GS-13 position or pay her a GS-13 salary even though she was performing GS-13 work.

[4] In addition, Davis points to several events predating her 2011 settlement agreement with the Department, which appears to bar claims based on them. *See* ECF No. 43-1 at 24–25; ECF No. 43-32 ¶¶ B(2)–(3) (Davis agreeing to "waive any and all claims for . . . pecuniary, . . . non-pecuniary and/or compensatory damages based on allegations raised in any claim or alleged claim

1.        **Reassignment from FSA-OCR to FSA-EPD**

Davis asserts that the Department retaliated against her for contacting an EEO counselor

in November 2016 and then filing this lawsuit in February 2017 when it transferred her from FSA-

OCR to FSA-EPD.[5]   In response, the Department says that it transferred Davis for the following

nonretaliatory reasons: (1) to remove her from Thompson's supervision, given their poor working

relationship and Davis's October 2016 performance review; and (2) because FSA-EPD had an

available position and needed another employee.  *See* ECF No. 43-1 at 30–31; ECF No. 43-10;

ECF No. 43-11 4:5–11, 5:16–20.  Thus, the Court considers whether Davis has pointed to evidence

from which a reasonable jury could find those reasons pretextual.  *See Brady*, 520 F.3d at 494;

*McGrath*, 666 F.3d at 1380 n.3.  She hasn't.

---

of employment discrimination against [the Department] arising prior to the effective date of [the] Agreement.").  Although Davis argues that the Department did not fulfill the agreement's terms, she offers no factual support for the notion that the agreement is not binding on her.  *See* ECF No. 49-1 at 2.  Specifically, she cites "Ex. 2 68:6-21" for her claim that the agreement was not "ful-filled," but nothing in the record matches that citation.  *See id.*

[5] The Department tries to knock this claim out from the start, relying on *Forkkio v. Powell* for the proposition that "'dissatisfaction with a reassignment' is a purely speculative injury."  ECF No. 43-1 at 29 (quoting 306 F.3d 1127, 1130 (D.C. Cir. 2002)).  But for retaliation claims, an employment action is materially adverse if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations omitted).  Even "[a] 'lateral transfer'—that is, a transfer involving 'no diminution in pay and benefits'—may[, in certain situations,] qualify as a materially adverse employment action."  *Mamantov v. Jackson*, 898 F. Supp. 2d 121, 128 (D.D.C. 2012) (quoting *Geleta v. Gray*, 645 F.3d 408, 411 (D.C. Cir. 2011)).  And "[w]hether a particular reassignment of duties constitutes an adverse employment action 'is generally a jury question.'"  *Craig v. Dist. of Columbia*, 881 F. Supp. 2d 26, 34 (D.D.C. 2012) (quoting *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007)).  Davis argues that this transfer was an adverse action because it was "not in line with her career goals" and "[h]er responsibilities changed significantly."  ECF No. 49-1 at 11 (citing ECF No. 43-52).  The Court will assume without deciding that Davis's transfer to FSA-EPD is an actionable employment action because, as it will explain, the Department's non-retaliatory explanation for the decision readily entitles it to judgment.

Davis's response on this point is haphazard, to say the least.  She begins by asserting that FSA-OCR's director—a superior in her chain of command—officiated the wedding of the man who allegedly sexually harassed her nearly a decade before her reassignment.  *See* ECF No. 49-1 at 10, 49-6 at 48:11-15.  And she points to a "good ole boys" culture in the workplace "where management officials try to 'eradicate problems' for each other."  *See* ECF No. 49-1 at 10.  But this kind of innuendo, and with no discernable link to the specific allegations here, won't do.  Suffice it to say that this conjecture does not suggest a genuine dispute of material fact.[6]  And no reasonable juror could rely on it to find for Davis.  *See Bruder v. Moniz*, 51 F. Supp. 3d 177, 188 (D.D.C. 2014) ("Speculation or conclusory allegations are not sufficient; the plaintiff must provide evidence to demonstrate that the employer's performance-based explanation is a lie.").

Davis also points to her difficult relationship with Thompson.  Citing only her complaint, her own declaration, and "information and belief," Davis says Thompson was having an affair with a more senior manager, Davis's discovery of which "marked a sharp downturn in their relationship."  ECF No. 49-1 at 10.  But nothing about this claim suggests that the *real* reason for Davis's transfer was her protected activity or undermines the Department's explanation in any material way.  The Department readily admits that Davis's bad working relationship with Thompson—as reflected and exacerbated by the altercation during Davis's performance review—caused the transfer, whatever else may have contributed to it.  ECF No. 43-1 at 10–11; *see* ECF No. 43-2 ¶¶ 21–26, 32; ECF No. 49-3 ¶¶ 21–26, 32.  So no reasonable juror could glean from this claim that Davis's transfer was not genuinely prompted by her bad relationship with Thompson, but instead by protected activity.

---

[6] Although Davis references a "Peterson Declaration," there is no such document in the record.  *See* ECF No. 49-1 at 10; ECF No. 49-4 (Plaintiff's exhibit list); ECF No. 43-3 (Defendant's exhibit list).  Other than that, she relies on only her own complaint.  *See* ECF No. 49-1 at 10.

Indeed, as reflected by the audio recording of Davis's performance review meeting, her transfer was on the table *before* she contacted the EEO counselor or filed this lawsuit, severely undermining the case for a causal link between the two.[7]  And on top of all that, Davis herself thought the relationship was unsalvageable and made demands that, as a practical matter, all but required her transfer to another division.  After the performance review, she refused to so much as work in the same building as Thompson.  ECF No. 51-1 ¶ 89; *see* ECF No. 49-1 at 5 (explaining Davis "pleaded" with a supervisor to move her to an office in a different building than Thompson). And she told other Department officials that "she did not want to have to go back into that work environment."  ECF No. 43-2 ¶ 38; ECF No. 49-3 ¶ 38.

Davis also tries to rely on the timing of events.  She contacted an EEO counselor in November 2016, right after her performance review in October 2016, and filed this lawsuit in February 2017; the Department then transferred her later that same month.  The problem for her is that "positive evidence beyond mere proximity is required to [prove retaliation]." *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011).  As explained above, Davis presents nothing of the sort.[8]  And

---

[7] ECF No. 43-15 (audio tape) (Thompson tells Davis: "I'm actually working on reassigning you from under me because [of the state of] our relationship . . . ."); *see also Scott v. Harris*, 550 U.S. 372, 381 (2007) ("[The court below] should have viewed the facts in the light depicted by the videotape.").

[8] Davis also argues her reassignment was "odd" because FSA-EPD was "a department that was not at all in her area of expertise," and her new role "was not in line with any of her career objectives."  ECF No. 49-1 at 11.  Even so "courts are not super-personnel departments that reexamine an entity's business decisions."  *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003) (cleaned up).  More than that, the record reveals that FSA-EPD simply needed staff.  ECF No. 43-11 at 4:5–11, 5:6–20.  Davis also accuses the Department's human resources director of telling her, after she filed her EEO complaint, that "if she did not retire, she would be placed on . . . administrative investigation because she had a 'reputation.'"  ECF No. 49-1 at 3, 11.  But once again, the exhibit Davis cites in support of this claim—a page within her own deposition—is not part of the record.  *See* ECF No. 49-6.  Instead, the record shows that the human resources director told Davis he was "unable to find a place for her to work, as her reputation was poor."  ECF No. 43-17 at 4.  He further testified that he "ha[d] no idea why her reputation was poor, and ha[d] no reason

in response to the Department's nonretaliatory explanation for the decision, Davis insists only that it is the jury's job to decide whether a reassignment is an "adverse action." *See* ECF No. 49-1 at 13.  That is, of course, no answer—the adverse-action requirement and the *McDonnell Douglas* pretext inquiry are entirely different elements of the larger Title VII framework.

In short, Davis has pointed to no evidence suggesting that the Department's explanation for her transfer—that is, her relationship and her altercation with Thompson—was pretextual, and that the real reason for her transfer was protected activity.  The Court finds that no reasonable juror could find that the Department retaliated against Davis when it transferred her to FSA-EPD.

### 2.  Paid Administrative Leave

Davis also argues that the Department retaliated against her by placing her on paid administrative leave in 2016, after the performance-review meeting, and again in 2018.  To begin with, whether placement on paid administrative leave qualifies as a material adverse action under Title VII is an open question in this Circuit.  *See Wesley v. Georgetown Univ.*, No. 18-cv--1539 (BAH), 2018 WL 5777396, at *6 (D.D.C. Nov. 2, 2018) ("The D.C. Circuit . . . expressly left open the question of whether being placed on administrative leave could constitute the type of adverse action that would support a retaliation claim." (citing *Hornsby v. Watt*, No. 17-5001, 2017 WL 11687516, at *1 (D.C. Cir. Nov. 14, 2017)).  But even assuming it so qualifies, the Department is still entitled to summary judgment.

Beginning with the 2016 episode, the Department offers a legitimate, nonretaliatory reason for the decision to place Davis on administrative leave: to find her a new assignment after the altercation with Thompson during her performance-review meeting.  *See* ECF No. 43-1 at 36; *see*

---

to believe it was because of her EEO activity." *Id.*  It was also standard practice to discuss retirement as one of several paths forward.  *See* ECF No. 51-3 at 4.  Thus, none of this moves the needle for Davis.

*also* ECF Nos. 43-13 at 22; 43-17 at 2–3.  The parties do not dispute that Davis was placed on leave mere days after the meeting.  ECF No. 51-1 ¶ 69.  Again, the audio recording of that incident is telling insofar as it depicts the meeting as a highly plausible reason for the Department to have placed her on leave.  During the meeting, Thompson presented clear and calm rationales for rating Davis as "fully successful" rather than "superior."  ECF No. 43-15 (audio tape).  In response, Davis attacked Thompson with offensive language and name-calling.[9]  *Id.*

Davis offers no rebuttal evidence that the Department had some other, unlawful rationale in mind when it placed her on leave.  In fact, she makes no effort to tether the Department's decision to any protected activity at *all*.  Unlike with her transfer claim, her 2016 EEO complaint cannot fit the bill because she contacted an EEO counselor only *after* she had been placed on leave.  Davis's burden is to present evidence that her protected activities—or something other than the Department's lawful justification—caused the Department to place her on administrative leave.  But she has presented no "evidence to demonstrate that [the Department's] . . . explanation is a lie."  *Bruder*, 51 F. Supp. 3d at 188 (D.D.C. 2014) (cleaned up).  Because she hasn't done so, the Department is entitled to summary judgment on this claim.

Davis fares no better on her claim related to the 2018 administrative leave.  The parties do not dispute that the Department placed Davis on leave right after her on-film outburst, which it points to as its nonretaliatory justification for doing so.  ECF No. 43-2 ¶¶ 61, 74; ECF No. 49-3 ¶¶ 61, 74.  Davis took the stage uninvited at a workplace event, yelled, and made gestures that some employees thought obscene.  ECF No. 43-20; ECF No. 43-21.  She does not dispute that

---

[9] While the parties dispute how these events should be characterized, neither party disputes the authenticity or accuracy of the recording—taken by Davis herself without Thompson's permission, ECF No. 43-4 at 55–56, and in violation of department policy, ECF No. 43-42 at 7.  So the Court may consider it.  *See Harris*, 550 U.S. at 381.

several employees complained they were offended.  ECF No. 43-2 ¶ 67; ECF No. 49-3 ¶ 67.  Of course, this sort of behavior is not protected activity, and Davis does not contend otherwise.  Again, Davis presents no evidence that she was placed on paid administrative leave in response to protected activity or for anything other than for this outburst, so the Department is entitled to summary judgment here, as well.

### C.    Retaliatory Hostile Work Environment and Hostile Work Environment Based on Disability Claims (Counts I and IV)

To succeed on a hostile-work-environment claim under either Title VII or the Rehabilitation Act, "the plaintiff must show that she was subjected to 'discriminatory intimidation, ridicule, and insult' of such 'sever[ity] or pervasive[ness] [as] to alter the conditions of [her] employment and create an abusive working environment.'"  *Jones v. District of Columbia*, 314 F. Supp. 3d 36, 53 (D.D.C. 2018) (quoting *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006)).  This is a "high bar" designed to "filter[] out complaints attacking the ordinary tribulations of the workplace" and prevent federal civil rights statutes from "imposing 'a general civility code.'"  *Mohmand v. Broad. Bd. of Governors*, 2018 WL 4705800, at *6 (D.D.C. Sept. 30, 2018) (quoting *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016)).

To survive, the "constituent acts [of a hostile work environment claim] must be 'adequately linked' such that they form 'a coherent hostile environment claim.'"  *Baird v. Gotbaum* ("*Baird II*"), 792 F.3d 166, 168–69 (D.C. Cir. 2015) (quoting *Baird v. Gotbaum* ("*Baird I*"), 662 F.3d 1246, 1251 (D.C. Cir. 2011)).  The "kitchen sink" approach will not do.  *See Faisan v. Vance-Cooks*, 896 F. Supp. 2d 37, 65–66 (D.D.C. 2012).   And courts may "conclude that . . . acts are so different in kind and remote in time from one another that they cannot possibly comprise part of the same hostile work environment."  *Id.*

Davis brings two hostile-work-environment claims, the first arising under Title VII and the second arising under the Rehabilitation Act.  Both come up well short.  Beginning with her Title VII claim, although it is far from clear, Davis's theory seems to be that the Department created a retaliatory hostile work environment in response to her 2016 EEO complaint, which she filed while on administrative leave for the first time.  *See* ECF No. 49-1 at 17.  She contends that in response, human resources "asked her to retire or be faced with an administrative investigation"; the Department refused to give her an office, ergonomic equipment, and "other basic office supplies" upon her return to FSA-EPD; her immediate supervisor never gave her a performance review; a supervisor "alter[ed] her time and attendance records" to show she was AWOL or LWOP when she was not; she was placed on administrative leave a second time in 2018 following her public outburst; and after she returned from administrative leave, she was assigned to an office lacking proper equipment and another supervisor denied her telework.  ECF No. 49-1 at 17–21.[10]  As for the disability-based hostile-work-environment claims, Davis reiterates that the Department denied requests for reasonable accommodations; twice placed her on administrative leave; improperly placed her on LWOP status; "forced her to use 30 hours of her sick leave" by refusing telework to

---

[10] As with other claims, Davis neglects to even mention several incidents she points to in her complaint as contributing to a retaliatory hostile work environment, no less "adequately link" them to other events to form a "coherent" claim.  *See Baird II*, 792 F.3d at 168–69; *see* TAC ¶ 105. So the Court will not consider these events in evaluating her claim.  Nor will it—for reasons the Court has already explained in denying Davis's motion for leave to file a fourth amended complaint—consider events that postdate the investigation into her 2018 EEO complaint.  *See* ECF No. 49-1 at 19–20, 29 (discussing efforts to reassign Davis to another division in 2019); *see also* ECF No. 42 at 7 (denying Davis's motion to amend the complaint to add claims about conduct postdating the 2018 EEO complaint because she "ha[d] not shown why claims that took place a year to a year-and-a-half [after her most recently exhausted EEO charge was filed] would have arisen from an investigation into events that concluded in May 2018 . . . and there is no obvious reason that the Court should conclude that they did").

create a hostile environment based on her "Chronic Anxiety and Depression"; and assigned her to an office lacking proper ergonomic equipment.  *See* TAC ¶ 123; ECF No. 49-1 at 26–32.[11]

Most of the incidents on which Davis relies for her hostile-work-environment claims are at least potentially independently actionable and are largely the same as those on which she based the Title VII and Rehabilitation Act claims the Court has already resolved against her.  Although a plaintiff may try to link discrete acts together to form a hostile-work-environment claim, such "acts must be adequately connected and must contribute to a coherent and severe or pervasive pattern of intimidation, ridicule, and insult."  *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 9 (D.D.C. 2019) (quotations omitted).  "And because such discrete acts tend to be different in kind from this type of misconduct, courts in this district are generally skeptical of plaintiffs bootstrapping their alleged discrete acts of [discrimination] into a broader hostile work environment claim." *Id.* (cleaned up).  More than that, when a plaintiff cannot "prevail on a standalone . . . claim," the same discrete, discriminatory act generally cannot "constitute 'severe or pervasive' harassment for purposes of a hostile work environment claim."  *Floyd v. Lee*, 85 F. Supp. 3d 482, 518 (D.D.C. 2015) (quoting *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 24 (D.C. Cir. 2013)); *see also Matos v. DeVos*, 317 F. Supp. 3d 489, 503 (D.D.C. 2018) ("To the extent that summary judgment

---

[11] The Department argues that the Court should refuse to consider many acts Davis offers in support of her hostile-work-environment claims because they are time barred.  To rely on time-barred events in a hostile-work-environment claim, "[a] plaintiff must show that the time-barred incidents are 'adequately linked' with the exhausted incidents 'into a coherent hostile work environment claim.'"  *Dudley v. WMATA*, 924 F. Supp. 2d 141, 164 (D.D.C. 2013) (quoting *Baird I*, 662 F.3d at 1251).  The Department provides a nonexhaustive list of allegations from the complaint it believes to be time-barred, to which Davis offers no response.  But as discussed, she abandons them at summary judgment, anyway.  Thus, the Court will not independently analyze whether to discount individual incidents as time-barred.  Suffice it to say that, for the reasons discussed throughout this opinion, Davis has failed to adequately link any of her problems with the Department into a coherent hostile-work-environment claim, timely or otherwise.

is appropriate to the Department on Matos's failure to accommodate claim, the same allegations cannot support a hostile work environment claim.").

Davis's attempt to cobble together independently unsuccessful discrimination claims into coherent and viable hostile-work-environment claims goes nowhere.  To show a hostile environment, she leans heavily on her placement on paid administrative leave.  These are not the kinds of claims that can make out a hostile work environment.  "[A]llegations that [Davis] was placed on leave without satisfactory explanation on several instances simply do not support a hostile work environment claim."  *See Sheller-Paire v. Gray*, 888 F. Supp. 2d 34, 42 n.8 (D.D.C. 2012).  Davis also argues that the Department's delay in providing certain accommodations (presumably a suitable office and equipment) was severe and pervasive harassment because "there are . . . circumstances in which a long-delayed accommodation could be considered unreasonable and hence actionable," ECF No. 49-1 at 21 (quoting *Mogenhan v. Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010)), and "[t]here is no doubt that the Agency's actions interfered with [her] work performance to the point where she simply could not do her job,"  ECF No. 49-1 at 21.  But whether such delay is independently actionable under the Rehabilitation Act is not the point.[12]  The question is whether Davis can marshal evidence in the record linking her disputes with the Department over her accommodations to other relevant evidence from which a jury could find that the Department subjected her to a hostile work environment.  On the record before the Court, she simply hasn't.

Davis's other stray complaints—like denial of telework, the LWOP issues, and deficient performance evaluations—"attack[] [only] the ordinary tribulations of the workplace."  *Achagzai*, 170 F. Supp. 3d at 183 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *see,*

---

[12]  In any event, at least some of the delay here is attributable to Davis's own failure to provide medical documentation supporting her requests.  *See* ECF No. 43-1 at 27; ECF No. 49-1 at 18; ECF No. 43-35 at 2; ECF No. 43-52 at 7.

*e.g.*, *Beckwith v. Ware*, 174 F. Supp. 1, 5–6 (D.D.C. 2014) (allegations including "denial of team award," "denial of 'telecommuting privilege,'" "placement of AWOL status," "deactivation of access card and removal from computer system" insufficient to state a hostile-work-environment claim); *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 93–94 (D.D.C. 2009) ("lowered performance evaluations," "unfair[] reprimand[s] and critici[sm]," "refusing [plaintiff] a window cubicle," and management's "opposition to [plaintiff's] transfer to another office or detail assignment," among others, insufficient to state a hostile-work-environment claim). They too do not raise a genuine issue for trial on her hostile-work-environment claims.

Taking her accusations against the Department as a whole and construing the record in her favor, Davis simply has not pointed to evidence of "intimidation, ridicule, and insult that is suffi-ciently severe or pervasive" to raise a jury question on whether such conduct "alter[ed] the condi-tions of [her] employment and create[d] an abusive working environment." *See Jones*, 314 F. Supp. 3d at 53. To be sure, the record betrays that some employees at the Department made dis-paraging comments about Davis and that her reputation there—justified or not—left much to be desired. *See, e.g.*, ECF No. 49-15 at 2. But "disparaging remarks" and "other negative comments do not sufficiently demonstrate a significant level of offensiveness" to sustain a hostile-work-en-vironment claim. *Nurriddin*, 674 F. Supp. 2d at 94. In the end, Davis's attempt to "to trans-form . . . challenges to discrete acts of alleged discrimination or retaliation, into a hostile work environment claim by combining those events with a series of ordinary workplace difficulties" falls far short of the high bar in this circuit to show severe and pervasive harassment. *See id*.

Finally, even if Davis's disjointed allegations told a coherent story, she points to no evi-dence on which a reasonable jury could infer that retaliatory or discriminatory intent motivated her supervisors' or other Department officials' behavior. Even severe harassment is not actionable

under antidiscrimination statutes unless there is "some connection between the alleged abuse and the plaintiff's protected status" or (for retaliation claims) protected activity.  *Golden v. Mgmt. & Training Corp.*, 266 F. Supp. 3d 277, 286 (D.D.C. 2017) (collecting cases).  And for many incidents, the Court has already specifically explained how no reasonable jury could find that the Department's actions were retaliatory.  *See Floyd*, 85 F. Supp. 3d at 518.

As for other incidents, Davis comes up empty on evidence of retaliatory or discriminatory intent too.  For example, several times, Davis mentions that she overheard the FSA-OCR director tell her immediate supervisor in that division to make her as "uncomfortable as possible" after she arrived.  *See* ECF No. 49-1 at 10.  But this allegation is no more than just that—an allegation in the operative complaint that is of no moment on summary judgment.  *See Celotex*, 477 U.S. at 322.  Amazingly, Davis points to no support for it in the evidentiary record.  *See* ECF No. 49-1 at 2 (citing TAC ¶ 77); *id.* at 10 (same); ECF No. 49-2 ¶ 48 (same).  In other words, Davis points to nothing from which a jury could find that this conversation ever happened; that if it did, it even concerned Davis; or that it suggests an unlawful motive on the part of other Department employees who, years later, took action against Davis.[13]

For all these reasons, the Court will grant summary judgment to the Department on Davis's hostile-work-environment claims.

---

[13] Nor does Davis's gesture toward much earlier protected activity permit any inference of retaliation or disability discrimination.  She appears to believe that all her woes with the Department throughout the relevant time stem from her "land[ing] in FSA-OSCR[] as a 'problem employee.'"  *See* ECF No. 49-1 at 2, 10.  But she identifies no evidence in the record to show any connection between her protected activity years earlier—her reporting of allegedly unethical conduct and sexual harassment; her EEO reports before 2016; or her cooperation in a whistleblower investigation—and the discrete Department actions of which she now complains.

### D.     Infliction of Emotional Distress Claim (Count V)

In her opposition, Davis attempts to "voluntarily dismiss" Count V of her complaint for intentional infliction of emotional distress.  ECF No. 49-1 at 32.  But a plaintiff may not voluntarily dismiss a claim after summary judgment briefing.  *See* Fed. R. Civ. P. 41(a)(1)–(2).  Rather, the Court will grant the Department summary judgment on it.  "The [Federal Tort Claims Act] represents a limited waiver of the government's sovereign immunity."  *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003).  To bring a claim under that statute, "claimants must exhaust their administrative remedies" by "present[ing] the claim to the appropriate federal agency."  *Taylor v. Clark*, 821 F. Supp. 2d 370, 374 (D.D.C. 2011) (quotations omitted).  Davis concedes she has not done so.  *See* ECF No. 43-33 at 8.

## IV.    Conclusion

For all these reasons, the Court will dismiss Count III sua sponte for lack of subject matter jurisdiction and grant the Department's motion for summary judgment on all remaining counts.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 18, 2023